## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NICOLE JANAKOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05 C 7194 |
| | ) |
| JO ANNE B. BARNHART, | ) Magistrate Judge |
| Commissioner of Social | ) Arlander Keys |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Nicole Janakos, now 34 years old, suffers from bilateral
carpal tunnel syndrome and fibromyalgia. She alleges that these
impairments, combined with migraine headaches, fatigue and her
obesity, prevent her from being able to hold down a job. On
April 16, 2004, she applied to the Social Security Administration
("SSA") for Disability Insurance Benefits and Supplemental
Security Income, but the SSA denied her application. After
unsuccessfully pursuing an appeal through the SSA's processes,
Ms. Janakos filed suit in this Court, seeking review of the
Administration's decision to deny her benefits. The case is
before the Court on cross-motions for summary judgment.

### Facts & Procedural History

On April 16, 2004, Ms. Janakos applied for Disability
Insurance Benefits and Supplemental Insurance Benefits, claiming

that, as of April 16, 2001, she was unable to work because of bilateral carpal tunnel syndrome and fibromyalgia. The SSA denied her claim initially on July 16, 2004, and upon reconsideration on September 30, 2004; both times the SSA concluded that, although her condition did cause some restrictions in her ability to function, she was still able to perform most activities of daily living and, therefore, had the ability to work as a customer service representative, a job she had held in the past. Record at 66, 71. Ms. Janakos requested a hearing before an Administrative Law Judge ("ALJ"), and the case was assigned to ALJ Edward B. Pappert, who held the requested hearing on February 3, 2005.

A.   Proceedings & Records Before the Administrative Law Judge

Ms. Janakos, who was represented by counsel, testified first at the hearing. Ms. Janakos testified that she is between 4' 9'' and 4' 10'' tall and weighs 210 pounds, and that she lives with her three year old daughter in Des Plaines, Illinois. *Id.* at 9, 30. She testified that she graduated from high school and had taken some college classes, but did not earn an associate's degree; further, she testified that she possesses a driver's license and is physically able to drive a vehicle. *Id.* at 15-16.

With respect to her past work experience, Ms. Janakos testified that, for approximately eight or nine years prior to

2

April 16, 2001, the day she claims to have become disabled, she worked in the field of air freight transportation as a customer service representative and as an operations assistant; chronologically, she first worked for Cargo Help, then for Pilot Air Freight ("Pilot"), and later for Merit Trade Systems ("Merit"); she testified that all of the jobs were similar in nature in that they involved transportation. *Id.* at 10, 12.

As far as her job responsibilities, Ms. Janakos testified that, at Pilot, she was responsible for assisting the terminal manager in interviewing and making decisions; specifically, she supervised two to four people, but was not responsible for hiring or firing. *Id.* She testified that her jobs at the three transportation companies were her last regular jobs; after April 16, 2001, the day she became disabled, she was out of work for about three years. *Id.* at 11.

Ms. Janakos testified that, in June of 2004, she returned to work part-time as an attendant in the kids' room at a fitness center; she testified that, in that job, she worked approximately 12 to 15 hours a week and her responsibilities included supervising children, cleaning or wiping down fitness machines, straightening up and cleaning around the gym. *Id.* at 11, 23-24. Ms. Janakos testified that she left that job after just a few months, was off work for a short time and then took another part-

3

time job, this time as a cashier for K-Mart. Ms. Janakos testified that, at K-Mart, she earned $6.50 per hour, working 2 to 4 days per week for a total of 15 to 20 hours per week. *Id.* at 9, 10, 15, 16, 20.

As far as her impairments, Ms. Janakos testified that she was first diagnosed with carpal tunnel syndrome in 1999, while working for Pilot as a supervisor. Record at 15, 28. She testified that Dr. Eugene Lopez was the first doctor to diagnose her with sub-electrical carpal tunnel syndrome; she testified that Dr. Lopez sent her to have a nerve conduction test, which came back normal. *Id.* at 15. Nevertheless, Ms. Janakos testified that she still experienced all the symptoms of carpal tunnel syndrome; and therefore, Dr. Lopez restricted her to limited, light duty work and a four hour work day; she testified that Dr. Lopez also sent her to occupational therapy to treat the symptoms. *Id.* However, Ms. Janakos testified that, because the transportation industry did not accommodate light duty work, she had a hard time following the doctor's restrictions; she testified that, as a result, she left Pilot for a job at Merit in order to decrease her job responsibilities. Record at 28.

Ms. Janakos testified that, at Merit, her job was less demanding, but that it also paid less than the job at Pilot; she testified that she continued to visit doctors for her carpal

4

tunnel issues while working. *Id.* at 12, 28-29. Ms. Janakos testified that, when she was hired at Merit, she informed the company that she had trouble handling data entry-type duties because of her carpal tunnel issues; nevertheless, she testified, her manager asked her to work a shift that required her to handle more data entry duties. She testified that she reminded her manager that the company was aware, when it hired her, that she was unable to handle such duties. *Id.* at 29-30. Ms. Janakos testified that Merit laid her off on April 18, 2001, about a month after asking her to switch shifts; at the time, the company told her that it had eliminated her shift; yet, she testified, she learned that Merit hired another person to work that same shift about a week later. *Id.*

Ms. Janakos testified that, even if Merit had not laid her off, she was not sure she could have continued working there because of her carpal tunnel syndrome. She testified that at about the same time Merit fired her, a different doctor conducted a second nerve conduction test, which showed positive results. As a result of those results, she was referred to a surgeon and underwent bilateral carpal tunnel release surgery in July of 2001. *Id.* at 13.

Ms. Janakos testified that the July 2001 surgery relieved her carpal tunnel symptoms for only about nine months, and that

eventually, her symptoms returned "to the point now where it is just as painful as it was before the surgery." *Id.* at 14. Ms. Janakos testified that as a result of the returning symptoms, she consulted a doctor who conducted another nerve conduction test in December 2002, which again read normal; she testified that the December 2002 test was her most recent nerve conduction test. *Id.* at 15-16.

Ms. Janakos testified that, while she was working at the fitness center during the summer of 2004, she was treated by Dr. Cator for hand pain relating to her carpal tunnel syndrome; she testified that Dr. Cater basically just recommended medication and rest. *Id.* at 24. Because of her pain, Ms. Janakos testified that she had a hard time completing some of her job duties; in particular she testified that it was hard for her to wipe the machines and to squeeze the cleaning solution from the rags with which she cleaned. *Id.* She testified that she left the fitness center job, not because of her pain, but because she was planning to move; she testified that the move fell through in the end, but not until after she had given her notice at the fitness center. *Id.* at 23.

Ms. Janakos testified that her carpal tunnel issues also interfered with her next job, the part-time cashier position at K-Mart. She testified that she experienced pain throughout her

working hours and that her condition pretty much prevented her from working more than 15 to 20 hours per week. *Id.* at 16, 33-34.

In addition to carpal tunnel syndrome, Ms. Janakos also claims to suffer from fibromyalgia; at the hearing before the ALJ, Ms. Janakos described her condition as an "all-over, body pain, within the joints." Record at 21. She testified that the fibromyalgia causes dizziness and memory loss; she testified that she gets dizzy if she turns her head from side to side, or if she catches something in the corner of her eye and turns back to look at it. *Id.* at 21-22. Ms. Janakos further testified that she experiences pain everywhere, including in her hands, arms, legs, knees, and feet; consequently, she testified, she can sit for only 20 to 30 minutes at a time before her back and knees become stiff, and she can stand for just 20 to 30 minutes at a time before her lower back and feet start to hurt. *Id.* at 31-32.

Ms. Janakos testified that, between her carpal tunnel and her fibromyalgia, her ability to work is significantly affected. *Id.* at 34. She testified that, because of her conditions, her legs, feet and hands hurt, and all of that pain decreases her ability to concentrate. *Id.* Beyond the pain, she testified that her hands tend to go numb, which also affects her ability to do her job; she testified that she has trouble grabbing coins off

7

the counter, she drops money and items being purchased, which can
sometimes spill; she has trouble scanning items across the belt
and turning her hand to scoop money; and she sometimes hits the
wrong keys on the register, which requires the manager to
override her mistakes. *Id.* at 16-17, 35. Ms. Janakos testified
that the pain and numbness in her hands has also compromised her
grip strength; specifically, she testified that she has a hard
time picking up larger, bulkier items like gallons of milk or two
liter bottles of pop. *Id.* at 35. Ms. Janakos testified that all
of these issues increase over the duration of her shift, so she
tries to get K-mart to schedule her such that she has a rest day
between work days. *Id.* at 17, 21. She testified that rest does
help alleviate her symptoms; she also uses several braces,
therapy putty, and ice and heat therapy. *Id.* at 17.

In addition to the carpal tunnel syndrome and the
fibromyalgia, Ms. Janakos testified that she also suffers from
migraine headaches. Record at 22. She testified that her
migraines develop in the forward and back parts of her head and
that she feels piercing and pinching in her eyes. *Id.* As far as
the frequency and severity of her headaches, Ms. Janakos
testified that her migraines last for 24 hours, and that she
suffers two to three migraine headaches a week; the migraines
cause her dizziness and vomiting. *Id.* at 22, 26. Ms. Janakos

testified that she treats her migraines with refrigerated sinus packs; she also testified that she has learned to recognize the signs of a migraine, and can sometimes treat them before they develop into the severe, 24-hour "full blown" migraines. *Id.* at 22-23, 26. Overall, Ms. Janakos testified that, now that she knows how to recognize the signs of her migraines and knows how to treat them, she probably suffers a full blown migraine a couple times a month, rather than two or three times a week like she used to experience. *Id.* at 28. Ms. Janakos testified, however, that problems arise because she is sometimes unable to treat her headaches at work, because K-Mart prohibits employees from bringing belongings to the cash register; she related one instance where she sensed a migraine at the end of her shift, and by the time she got home, it had developed into a full blown migraine. *Id.* at 26. She testified that, to manage her migraines, she would have to be able to take a break when she feels the migraine starting to develop; she testified that it would take her five to ten minutes to go to her locker and retrieve her medication. *Id.* at 27, 41.

With respect to her daily activities, Ms. Janakos testified, on a typical day, she usually wakes up around 8:00 a.m. *Id.* at 18. She testified that when she is not at work, she takes care of her daughter, performs household chores, and runs errands, all

9

without any assistance from friends or family. Record at 17-18. She testified that her ability to accomplish her housework varies depending on how she feels in the morning; she elaborated that there are days where she can get up in an hour and accomplish chores normally, but that there are also days when her body is too stiff to do much in the way of chores. *Id.* at 18. Additionally, she testified that her pain, stiffness, and swelling are affected by her work load, the weather, and general life activities; in particular, she testified that a busy night at work or tackling a lot of household chores affects her symptoms; she testified that grocery shopping, house cleaning, and doing laundry cause soreness. *Id.* Ms. Janakos also testified that cooking, stirring, and lifting can be hard for her; she testified that she is unable to clean for even an hour straight and that she is pretty much always sore after working. *Id.* at 24, 25. She testified that cold weather causes stiffness and that extreme heat makes her swollen. *Id.* at 19. Ms. Janakos testified that she attempts to exercise by doing a low impact cardio tape once a week, but that she fatigues after about 10 or 15 minutes. *Id.* at 30, 31.

Ms. Janakos testified that she takes roughly 10 medications every day, and she also uses an inhaler for her asthma. Record at 19-20. She testified that the effectiveness of her

medications varies, and that she sometimes forgets to take them. *Id.* at 20. She testified that some of her medications cause drowsiness or fatigue; in particular, she testified that her sleeping medication makes her feel groggy and tired the next day. *Id.* at 20-21.

In addition to Ms. Janakos, the ALJ also heard from Christopher Yep, a vocational expert. Record at 36-43. Initially, the ALJ asked VE Yep how he would characterize Ms. Janakos' past work. *Id.* at 36. VE Yep testified that Ms. Janakos' cashier job was an unskilled position performed at a light level of exertion; he characterized Ms. Janakos' customer service position as a skilled position and her position as an operations manager at Pilot as a skilled position performed at a medium level of exertion; further, he testified that her position at Merit was a skilled position performed at a medium level of exertion, and that her position at the fitness center was an unskilled position performed at a light level of exertion. *Id.* at 36-37. VE Yep also testified that Ms. Janakos' customer service skills were transferable to a light level of exertion. *Id.* at 37.

Next, the ALJ asked VE Yep whether, given her limitations, Ms. Janakos might be able to perform her past work, including her jobs as a cashier or a child care attendant. *Id.* at 38.

11

Specifically, the ALJ asked VE Yep to consider whether those jobs could be performed by a hypothetical person who: (1) was 32 years old; (2) had completed high school and had some college education; (3) had Ms. Janakos' past work experience; (4) was unable to lift and carry more than 10 pounds frequently and 20 pounds occasionally; (5) was unable to perform postural movements, such as stooping, crouching, crawling, and kneeling more than occasionally; (6) was unable to use her hands for constant grasping or fine manipulation; (7) and was unable to work in areas that were concentrated with amounts of pulmonary irritants. *Id.* VE Yep testified that a person described as such a person would still be able to work as a cashier or in child care. *Id.*

The ALJ then changed the hypothetical question to include a limitation for use of the hands for *repetitive* grasping and fine manipulation, as opposed to *constant* grasping and fine manipulation, characterizing the new hypothetical as "[i]n other words, I guess a step down." *Id.* VE Yep testified that such a person could still work in child care, but could not work as a cashier. *Id.* Further, VE Yep added that employers in the types of occupations described typically only tolerate absentee rates of one day per month or 12 days per year, and that employees with higher absentee rates would be, essentially, unemployable. *Id.*

12

The ALJ then asked VE Yep whether the hypothetical person's need to change position from time to time, while still being able to maintain a position for 50 minutes to an hour, would affect his assessment of the person's ability to perform her past relevant work. *Id.* at 39. In response, VE Yep testified that the hypothetical person could still work as a cashier, but would have trouble performing the child care work; VE Yep testified that, to be productive, a cashier would have to be able to maintain position for a minimum of 45 minutes. *Id.*

Ms. Janakos' attorney then asked VE Yep whether his conclusions would change if the hypothetical person, in addition to being unable to grasp and perform fine manipulations, was off task for 10 to 15 percent of the work day due to pain and/or fatigue; VE Yep testified that such a person would be unable to perform work as a cashier or in child care. Record at 40. Counsel then asked VE Yep if the ability to do the cashier position or the child care position would be affected if the hypothetical person took two breaks of five to ten minutes per week. *Id.* at 41. The VE testified that "[i]f it means regularly having to take two unscheduled breaks per week, that would wear on an employer's tolerance, and they probably would not tolerate that." *Id.*

Finally, Ms. Janakos' attorney asked the VE whether the

13

hypothetical person's ability to work would be affected if the person could use her hands for no more than five minutes at a stretch, or if the person suffered numbness in her hands, such that five or six times out of the work day, the person would drop things. *Id.* at 42. The VE testified that these described limitations would not prevent the person from working in a child care position, but they would prevent her from working as a cashier. *Id.* The VE also testified that *any* deficiency in attention and concentration would eliminate the child care position, which required 100 percent of an employee's attention. *Id.*

In addition to the testimony given by Ms. Janakos and VE Yep, the ALJ considered medical records documenting Ms. Janakos' impairments, including progress notes and assessments from various doctors and medical facilities that evaluated her. First, the record contains progress notes from Dr. Eugene Lopez, the doctor who initially treated Ms. Janakos' carpal tunnel syndrome. The notes document each appointment he had with Ms. Janakos, the first on September 22, 1999 and the last on April 5, 2000. Record at 160-172. According to the notes, from the outset, Ms. Janakos complained of pain, numbness, and tingling in the first three digits of her hand. *Id.* at 165. According to Dr. Lopez, Ms. Janakos explained that her symptoms began at her

14

job, where she had to type frequently; she also reported that she had started to drop things. *Id.* At the time of her initial visit, Dr. Lopez performed several tests and, based upon the results of those tests, diagnosed Ms. Janakos with "work related right carpal tunnel syndrome"; he treated her with steroid injections and Lidocaine, a local anesthetic. *Id.* The record shows that Dr. Lopez advised Ms. Janakos to wear a wrist splint and to perform certain exercises, which he taught her. *Id.* Dr. Lopez advised Ms. Janakos to refrain from lifting anything more than five pounds, and he limited her to light duty, nonrepetitive work; he also ordered an electromyography ("EMG"). *Id.*

The record shows that Ms. Janakos returned to Dr. Lopez on October 14, 1999, complaining that her discomfort prevented her from returning to work. Record at 166. Dr. Lopez reported a positive EMG; he noted, however, that, based on the results of other tests, her condition appeared to be improving. *Id.* Further, Dr. Lopez indicated that Ms. Janakos possessed normal sensation to light and had a normal vascular exam. *Id.* Dr. Lopez' notes reveal that, in his view, Ms. Janakos had made progress, and he advised her to continue hand therapy and to stay off work for another two weeks. *Id.*

Ms. Janakos next visited Dr. Lopez on October 28, 1999; at that time, she complained of intermittent pain. Record at 167.

15

At this visit, Dr. Lopez noted that Ms. Janakos' EMG was negative, her Phalen's was positive, her Tinel's was negative, and she had no thenar atrophy. *Id.* Dr. Lopez more specifically diagnosed Ms. Janakos with right subelectrical carpal tunnel syndrome, and restricted her to four hours of nonrepetitive, light duty work per day, with a five pound maximum lifting limit. *Id.* He advised Ms. Janakos to return for another visit in one month. Id.

The record shows that Ms. Janakos next saw Dr. Lopez on November, 18, 1999; at that time, she reported that she had returned to work and was very frustrated because her symptoms had worsened and had spread to her left hand. *Id.* at 168. According to Dr. Lopez, Ms. Janakos had a minimally positive Phalen's, a negative Tinel's, and a normal EMG; he also noted that she had been undergoing physical therapy and that the notes from the therapist suggested that she was experiencing some success with her program. *Id.* The record shows that, at that time, Dr. Lopez referred Ms. Janakos to Dr. Brian Neal, an orthopedic hand specialist, and he advised Ms. Janakos to both stay off work and to continue her therapy until she could see Dr. Neal. Id.

Ms. Janakos saw Dr. Lopez again on December 16, 1999, at which time she complained that, even though she worked just four hours a day, she was still suffering dorsal wrist pain. Record

16

at 169. Dr. Lopez also noted that, since her last appointment, Ms. Janakos had had two other independent evaluations, one by Dr. Brian Meuller, a hand specialist, and another by a hand specialist whose report he did not have. *Id.* Dr. Lopez indicated that Ms. Janakos' extensor hallucis longus was tender with minor swelling; her Phalen's test was minimally positive and her Tinel's test was negative; she also had normal sensation to light touch and negative EMG tests in both hands. *Id.* At this appointment, Dr. Lopez diagnosed Ms. Janakos as suffering from – in addition to the subelectrical carpal tunnel syndrome – "dorsal wrist tendonitis" and "possible intercepts syndrome." *Id.* Despite this, the notes show that, in Dr. Lopez' view, Ms. Janakos was achieving "maximal medical improvement"; he thus affirmed the four hour per day light duty, five pound maximum, nonrepetitive work restrictions, and advised Ms. Janakos to return in one month. *Id.* In addition, the doctor noted the likelihood that he would need to send Ms. Janakos for a functional capacity evaluation ("FCE"), and that he was considering placing Ms. Janakos on permanent work restrictions. *Id.*

The record shows that, at her next visit with Dr. Lopez, on January 17, 2000, Ms. Janakos complained that her employer was trying to force her back to work and was refusing to comply with

17

Dr. Lopez's prescribed work restrictions. *Id.* at 170. Dr. Lopez noted that he had treated Ms. Janakos conservatively for five months and that two independent evaluations by other orthopedic surgeons concurred with his diagnosis and treatment. *Id.* He noted that Ms. Janakos had achieved maximal medical improvement and had reached a maintenance type situation; he instructed her to complete her course of therapy. *Id.*

Ms. Janakos visited Dr. Lopez again on February 22, 2000; at that time, Dr. Lopez noted that Ms. Janakos suffered from "minor tendinitis and carpal tunnel syndrome, all work related." Record at 171. He again noted that she was "at maximal medical improvement," or "MMI", and he again noted that permanent work restrictions may be necessary. *Id.*

According to the record, Dr. Lopez saw Ms. Janakos for the last time on April 5, 2000. At that time, Dr. Lopez noted that Ms. Janakos continued to experience "nonspecific discomfort over her forearms and wrists," that she had reached MMI, that her functional capacity evaluation revealed "some permanent partial disability regarding certain types of work," but that she could return to work "according to her functional capacity evaluation." Record at 172.

In addition to Dr. Lopez' notes, the record includes progress notes and evaluation forms from Alexian Brothers Medical

18

Center, where Dr. Lopez referred Ms. Janakos for occupational
therapy. Record at 173-223. The progress notes detail each of
Ms. Janakos' therapy sessions, and the evaluation forms document
Ms. Janakos' chief complaints and the progress of her therapy, as
well as the goals for her future therapy sessions. *Id.*
According to the notes, Ms. Janakos began her course of therapy
on October 4, 1999. Record at 174. At that first session, the
therapist noted that Ms. Janakos complained of pain and swelling
in her wrist and also noted that Ms. Janakos' wrist extension,
grip strength, endurance, and hand coordination were all poor.
*Id.* at 187-88. The evaluation indicates that Ms. Janakos'
treatment included an exercise program for Ms. Janakos to perform
on her own at home, as well as stretching and strengthening
exercises; the therapist also worked to educate Ms. Janakos about
her condition and about how she could help herself. *Id.* at 187.
According to that initial evaluation, Ms. Janakos' goal in
occupational therapy was to be able to write at work without pain
by the time of her discharge. *Id.* at 188. The record shows that
the initial plan was for Ms. Janakos to attend three occupational
therapy sessions per week, for two weeks. *Id.* The record shows
that, between her initial evaluation on October 4, 1999, and her
next evaluation on October 12, 1999, Ms. Janakos attended three
therapy sessions; the evaluation form from October 12 indicates

19

that Ms. Janakos had made some progress. *Id.* at 190. Another
therapy evaluation form dated October 27, 1999 shows that,
according to the therapist, Ms. Janakos had met her goals – her
strength had increased, her pain had decreased, and she was
continuing to improve. *Id.* at 192. The form also indicates,
however, that Ms. Janakos continued to experience occasional
numbness in her hand, pain "every other day," and stiffness and
pain caused by writing. *Id.* at 191.

The next therapy evaluation form, dated November 16, 1999,
indicates that Ms. Janakos' wrist pain had increased since her
last evaluation, and that she had now started to drop things.
*Id.* at 193. Consequently, the therapist noted that Ms. Janakos'
progress had regressed, indicating that her wrist extension and
gripping ability had decreased and that her pain and edema had
increased. *Id.* at 194. The therapist documented Ms. Janakos'
future goals as being able to perform normal tasks without
difficulty, and to reduce her pain and edema. *Id.*

By December 3, 1999, according to occupational therapy
progress notes from that day, the therapist indicated that Dr.
Lopez wanted Ms. Janakos to discontinue occupational therapy;
therefore, as of December 3, 1999, Ms. Janakos was discharged
from occupational therapy. *Id.* at 184.

The record shows that Ms. Janakos resumed occupational

20

therapy on January 3, 2000. *Id.* at 196. The initial evaluation form from that day indicates the Ms. Janakos was to attend treatment two times per week for four weeks, and that she was back at work for four hours per day with restrictions. *Id.* at 214. The evaluation indicates that Ms. Janakos' treatment would include a home program, stretching, strengthening, edema control, joint protection, and patient education. *Id.* According to the evaluation, Ms. Janakos' coordination and sensation were intact, but she had poor endurance and strength, in addition to pain and edema. *Id.* The therapist indicated that the overall goals of this course of therapy would be to decrease pain and tightness in Ms. Janakos' right upper extremity (the area from her right shoulder down to her right hand) while she performed tasks. *Id.* at 215.

The record shows that Ms. Janakos showed improvement with therapy; the therapy reevaluation form from January 28, 2000 indicates that Ms. Janakos' use of a wrist wrap helped her to reduce pain and that writing was becoming easier for her. *Id.* at 217. The therapist indicated that Ms. Janakos' progress was improving, noting that she had increased strength and decreased edema; she had met six of her seven goals established by the previous evaluation form. *Id.* at 216.

Ms. Janakos' progress at subsequent therapy visits was

21

reportedly not so successful; the occupational therapy evaluation form from March 3, 2000 shows that Ms. Janakos' pain had increased since she had returned to work. *Id.* at 220. The therapist indicated that Ms. Janakos' progress had regressed; particularly, she failed to meet five of the seven goals from the previous evaluation and she had not increased her strength or decreased her pain. *Id.* at 221. The last evaluation form from Ms. Janakos' course of occupational therapy was completed on March 21, 2000; the form indicates that Ms. Janakos reported shooting pains, muscle cramps, numbness and tingling up her arm, and that she experienced pain in writing, pain in both arms, and throbbing in her arms on busy days. *Id.* at 222. Consequently, the therapist again marked that Ms. Janakos' progress had regressed. *Id.* at 223.

In addition to the notes relating to Dr. Lopez and the occupational therapy regimens he prescribed, the record also includes medical records from Dr. Terry Younger, the physician who performed carpal tunnel surgery on Ms. Janakos. Record at 224-231. Ms. Janakos visited Dr. Younger between May 18, 2001 and August 13, 2001, for carpal tunnel surgery and check-up visits to evaluate her recovery. *Id.* An initial evaluation form dated May 18, 2001 and prepared by Dr. Younger indicates that Ms. Janakos complained of bilateral hand pain and intermittent

numbness; according to Dr. Younger, Ms. Janakos reported that her work as a secretary in 1997 sparked the symptoms. *Id.* at 225. Dr. Younger acknowledged in the form that Ms. Janakos had previously seen Dr. Eugene Lopez, Dr. Brian Neil, and Dr. Mark Cohen to evaluate her symptoms. *Id.* Dr. Younger indicated that Ms. Janakos complained of persistent symptoms of pain in her hands, digits, forearms, and upper arms; he noted that an EMG performed in 1999 showed normal results and that Ms. Janakos was variously diagnosed as having carpal tunnel syndrome, intersection syndrome, and tendonitis; he reported that Ms. Janakos had tried splinting and injections in the past and that her symptoms seemed to increase at night. *Id.* He further noted that Ms. Janakos' most recent EMG showed carpal tunnel syndrome bilaterally. *Id.* According to Dr. Younger's records, Ms. Janakos was four months pregnant at the time of the initial evaluation, so he wanted her to obtain clearance from her obstetrician before he would perform surgery. *Id.* Ms. Janakos received that clearance, and she elected to proceed with bilateral endoscopic tunnel release surgery, which Dr. Younger performed on July 6, 2001. *Id.*

The record shows that Dr. Younger reported "good release of tissue" in both wrists; he further noted that Ms. Janakos "tolerated the procedure well and was sent to the recovery room

23

in stable condition." *Id.* at 227-228. According to Dr. Younger's follow-up notes, Ms. Janakos initially experienced mild pain and swelling; Dr. Younger advised her to work on her range of motion and to increase her activities as guided by pain. *Id.* On Ms. Janakos' second follow up appointment, on August 13, 2001, Dr. Younger commented that she showed swelling, but that she was improving. *Id.* at 230. Dr. Younger concluded that Ms. Janakos' post bilateral endoscopic carpal tunnel release surgery status was improved; he indicated that he advised her to continue performing soaks and range of motion exercises, to apply ice after exertional activities, and to return as needed. *Id.*

The record also contains medical records from Dr. Peter Kiefer, who was Ms. Janakos' treating physician from September 26, 2002 to October 28, 2004. Record at 256, 260-276. Initially, on September 26, 2002, Dr. Kiefer completed a form detailing Ms. Janakos' medical and social history; he indicated that Ms. Janakos had a history of asthma, that her maternal grandmother had rheumatoid arthritis, that her sister had asthma, and that her father, sister, and grandfather had heart problems. *Id.* at 259. He also indicated that Ms. Janakos had bilateral carpal tunnel surgery in July 2001 and had a caesarian section on November 2001. *Id.*

According to Dr. Kiefer's progress notes, on December 6,

24

2002, Ms. Janakos' chief complaints were tingling and swelling in both hands; Dr. Kiefer noted that she had a positive Tinel's, in addition to sinus headaches, but that her asthma was quiet. *Id.* at 260, 263. At that appointment, Dr. Kiefer indicated that he would order EMG tests for both of Ms. Janakos' hands and he instructed Ms. Janakos to use a splint and to take ibuprofen to address her pain. *Id.*

On May 12, 2003, Ms. Janakos visited Dr. Kiefer, complaining that her asthma was acting up; Dr. Kiefer indicated that he would prescribe Ms. Janakos with an Atrovan inhaler to treat the asthma; he further noted that Ms. Janakos' headaches were "OK" with the headache medication he had prescribed. *Id.* at 264, 265.

Ms. Janakos next visited Dr. Kiefer on August 21, 2003, complaining of sinus problems; Dr. Kiefer indicated that his assessment for this visit was fibromyalgia and asthma; he documented that Ms. Janakos had body pain and joint pain, and that her sinuses were chronically clogged; he prescribed Celebrex, a medication to treat joint pain and stiffness. *Id.* at 266-267.

The record shows that Ms. Janakos consulted Dr. Kiefer on June 15, 2004 to discuss her disability; Dr. Kiefer noted that Ms. Janakos had carpal tunnel syndrome and fibromyalgia, and indicated that Ms. Janakos had swollen hands, diffuse pain and

25

swelling, trouble sleeping, and that she was always tired; he noted that she was taking Imitrex at the time. *Id.* at 270. On August 18, 2004, Dr. Kiefer addressed Ms. Janakos' complaints of a thyroid problem; he documented that she still felt tired, had joint stiffness, and had trouble sleeping. *Id.* at 272. Still experiencing carpal tunnel related symptoms, Ms. Janakos, according to Dr. Kiefer, on September 16, 2004, complained of pain in both of her hands, and he documented that she had hand pain for days, as well as, swelling and aches in her left elbow and arm. *Id.* at 275. Ms. Janakos also visited Dr. Kiefer on October 28, 2004, complaining of dizziness and migraine headaches; in his progress notes from that day, Dr. Kiefer indicated that she experienced headaches for three days and had a history of migraine headaches; he also noted that she reported a problem in her eyes and that she was losing her balance. *Id.* at 276.

Along with Dr. Kiefer's progress notes, the record contains an "Arthritic Report," an assessment prepared by Dr. Kiefer on June 15, 2004, and submitted to the SSA for the purpose of establishing Ms. Janakos' eligibility for disability benefits. *Id.* at 244. In his assessment, Dr. Kiefer noted Ms. Janakos' diagnoses of chronic carpal tunnel syndrome and fibromyalgia; he also noted that Ms. Janakos reported experiencing pain in her

26

arms and hands, and stiffness and swelling in her hands.  *Id.*  He
indicated that she had decreased thumb mobility in both of her
hands caused by pain, and numbness and weakness in her hands.
*Id.*  Dr. Kiefer indicated that Ms. Janakos had significant
limitations, with both hands, in completing repetitive reaching,
handling, fingering, grasping, turning, and twisting; Dr. Kiefer
marked that Ms. Janakos had difficulties with holding utensils,
combing hair, dialing the phone, turning pages of a newspaper,
turning door knobs, and buttoning and zipping her clothing.  *Id.*
at 244, 245.  Dr. Kiefer also determined that Ms. Janakos could
stand or walk for only 30 minutes at a time without pain, and
could only sit or stand for 30 minutes at a stretch; moreover he
indicated that Ms. Janakos was unable to use the unoccupied upper
extremity for lifting 10 pounds, and that she required a job that
permitted her to shift positions at will, from sitting, standing,
and walking, because she could only hold her legs in one position
for 30 minutes.  *Id.* at 245.

The record also includes a report from Dr. Scott A. Kale,
who evaluated Ms. Janakos at the request of the SSA.  Dr. Kale
completed an assessment entitled "Internal Medicine Consultative
Examination for the Bureau of Disability Determination Services,"
on June 12, 2004.  Record at 240.  Dr. Kale did not review
medical records, but he did interview and examine Ms. Janakos

27

over a 44-minute period. *Id.* Based on his examination, Dr. Kale classified Ms. Janakos as obese; he noted that, despite her carpal tunnel syndrome, she demonstrated normal grip strength and normal fine and gross motion. *Id.* With regard to her fibromyalgia, Dr. Kale identified 8 out of 18 tender points, which fell short of the diagnostic threshold for fibromyalgia of 11 out of 18 tender points. Dr. Kale determined that Ms. Janakos' lumbar and cervical spine ranges of motion were normal; that she was able to bear weight; that she had a normal gait and could perform a tandem gait; and that she was able to hop on one leg, do the heel-and-toe walk, and squat down. *Id.* at 242. In the end, Dr. Kale noted four clinical deficiencies in Ms. Janakos: (1) obesity; (2) status post carpal tunnel syndrome, though with good function; (3) probable sleep apnea or related syndrome of marked fatigue; and (4) asthma. *Id.* at 243.

Finally, the record contains a Residual Functional Capacity assessment prepared by SSA physician Dr. Sandra Bilinsky on July 12, 2004. Record at 248-255. Dr. Bilinsky listed carpal tunnel syndrome as Ms. Janakos' primary diagnosis and asthma as her secondary diagnosis; she also noted that Ms. Janakos claimed to be suffering from fibromyalgia. *Id.* at 248, 255. Based on her review of the medical records, Dr. Bilinsky opined that Ms. Janakos had no exertional limitations (that is, no limitations in

her ability to lift and carry, stand and walk, sit, or push and pull); no postural limitations (that is, no limitations in her ability to climb, balance, stoop, kneel, crouch or crawl); no manipulative limitations (that is, no limitations in her ability to reach, handle, finger or feel); no visual limitations and no communicative limitations. *Id.* at 249-252. Dr. Bilinsky did opine that Ms. Janakos had one environmental limitation: she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. *Id.* at 252.

## B. The ALJ's Decision

The ALJ issued his decision on June 24, 2005, finding that Ms. Janakos was not disabled and denying her claim for benefits. Record at 55-59. In particular, the ALJ found that, although the record indicated that Ms. Janakos had carpal tunnel syndrome, it did not contain evidence that satisfied the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. *Id.* at 56. Similarly, the ALJ found that, while Ms. Janakos had asthma, the record did not contain any pulmonary function studies with results equivalent to that required under the tables associated with section 3.02 of the Listings. *Id.*

The ALJ did find that Ms. Janakos' condition produced limitations which met the definition of "severe," but qualified

his findings by addressing the objective medical evidence. *Id.* at 57-58. Specifically, with respect to her carpal tunnel syndrome, he noted that she had carpal tunnel release surgery, and credited that she "had complaints of pain in both hands with evidence of some swelling," but also concluded that the lack of detail of Dr. Kiefer's progress notes failed "to provide additional support toward the claimant's allegations of her impairment causing severe restrictions." *Id.* at 57-58. With respect to her allegations of fibromyalgia, the ALJ found that Ms. Janakos only demonstrated 8 of 18 tender points, and that her gait was normal. *Id.* at 58. As far as Ms. Janakos' complaints of migraine headaches, the ALJ determined that progress notes failed "to indicate any type of aggressive treatment." *Id.* at 58.

Based upon his assessment of the objective medical evidence, the ALJ determined that Ms. Janakos was precluded from the following work-related activities: lifting more than 20 pounds occasionally or more than 10 pounds frequently; stooping, crouching, crawling and kneeling more than occasionally; performing jobs where constant grasping and fine manipulation are required; and performing jobs in an environment containing any respiratory irritants in concentrated levels. *Id.* at 57-58. He determined that "the objective medical evidence does not provide

a basis for finding limitations greater than those determined in this decision." *Id.* at 57. Based upon his findings regarding Ms. Janakos' work limitations, and based upon the testimony of VE Yep, which the ALJ claimed to have adopted, the ALJ concluded that Ms. Janakos could still work as a cashier and was, therefore, not disabled and not entitled to benefits. *Id.* at 58.

The ALJ's decision became the final agency decision when the Appeals Council denied review on November 1, 2005. *See* 20 C.F.R. §§404.981, 416.1481; Record at 45. Ms. Janakos then filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on April 16, 2006. Thereafter, both parties moved for summary judgment. Ms. Janakos asks the Court to reverse the Commissioner's denial of her claim for benefits, or, in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's findings.

## Discussion

Disability Insurance benefits are available only to claimants who can establish "disability" under the terms of the Social Security Act. The social security regulations provide a five-step sequential analysis for determining disability for

purposes of eligibility for benefits. Under the regulations, the ALJ is required to evaluate, in sequence, (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. *Id.* (citing *Knight*, 55 F.3d at 313).

A district court reviewing an ALJ's decision under the above analysis must affirm if the decision is supported by substantial evidence and free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Where, however, "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. In the Seventh Circuit, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate finding. *Blakes*

*ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

Applying the five-step analysis outlined above, the ALJ first determined that, although Ms. Janakos had performed some work, he did not need to determine definitively whether that work constituted "substantial gainful activity"; he concluded merely that he would not deny her application on that basis. Record at 56. At steps two and three, the ALJ concluded that Ms. Janakos' condition produced limitations that met the definition of "severe," but that her impairments did not meet or medically equal a listed impairment. *Id.*

At step four, the ALJ first assessed Ms. Janakos' residual functional capacity, which defines what Ms. Janakos' could do in spite of her limitations. *Id.* The ALJ determined that Ms. Janakos' medically determinable impairments precluded her from: lifting more than 20 pounds occasionally or more than 10 pounds frequently; stooping, crouching, crawling and kneeling more than occasionally; performing jobs where constant grasping and fine manipulation are required; and performing jobs in environments containing any respiratory irritants in concentrated levels. *Id.*

33

The ALJ recognized that Ms. Janakos claimed to have constant joint pain throughout her body, as well as memory problems and dizziness, and that she claimed to be unable to do many activities because of side effects from medications, which included drowsiness and tiredness. Record at 57. Yet, the ALJ concluded, the objective findings failed to support either Ms. Janakos' allegations of disabling symptoms and limitations, or the existence of limitations greater than those described above. *Id.* Specifically, the ALJ recognized that Ms. Janakos' medical record did show a history of carpal tunnel syndrome (he noted that a May 2001 report indicated that she had persistent pain in her hands and forearms); but he pointed out that a December 16, 2002 EMG study by a Dr. Levy showed that her results were normal for both arms. *Id.* And, although the ALJ recognized that Dr. Kiefer's progress notes documented complains in both hands throughout the period from June 15, 2004 to September 16, 2004, he determined that the "lack of detail in the report fails to provide additional support towards [Ms. Janakos'] allegations that her impairment [causes] her severe restrictions." *Id.*

The ALJ also recognized that the record contains some evidence of fibromyalgia, including Dr. Kale's 2004 consultative examination. On the flip side, he noted that the same report showed that Ms. Janakos had just 8 out of 18 tender points.

Record at 57.  Similarly, with respect to Ms. Janakos' migraines
and dizziness, the ALJ determined that Dr. Kiefer's October 28,
2004 progress notes failed to indicate any type of "aggressive
treatment" that would prompt him to find a more severe residual
functional capacity.  Id.

The ALJ concluded, in sum, that the objective medical
evidence did not support Ms. Janakos' claim of greater
limitations than those established by his decision.  Id.

Thereafter, the ALJ addressed Ms. Janakos' testimony with
respect to her daily activities; he noted that Ms. Janakos was
independent in self-care; specifically, he noted her testimony
that she cared for a young child, ran errands, performed
housework, and was able to do some aerobic exercises, all without
any assistance from family or friends.  Id.  Consequently, the
ALJ determined that, while "she did state that her ability to
perform household chores was dependent on how she felt in the
morning, it does not diminish the fact that the claimant is
functioning at a level that would be considered compatible with
the ability to perform a range of light exertional work."  Id.
Indeed, the ALJ noted, Ms. Janakos had been working as a cashier
since November 2004, and, prior to that, she had been working in
child care.  Id.  Thus, the ALJ found that, although Ms. Janakos
claimed that she was unable to perform basic activities, "her

actions have been to the contrary and fail to provide any support for her arguments and allegations." *Id.* Additionally, the ALJ determined that Ms. Janakos' subjective allegations lacked credibility, because they failed to describe restrictions that would support a finding of more restrictive limitations. *Id.*

Based on his assessment of the objective medical evidence and Ms. Janakos' testimony concerning her daily activities, the ALJ determined that Ms. Janakos was capable of performing her past relevant work as a cashier. Record at 58. In so concluding, the ALJ stated that he was adopting VE Yep's testimony. Specifically, the ALJ noted that the VE testified that an individual with the same residual functional capacity as Ms. Janakos could perform her past relevant work as a cashier. *Id.* Therefore, the ALJ determined that Ms. Janakos was not disabled and not entitled to benefits. *Id.* The ALJ did not reach step five of the analysis

Ms. Janakos argues that the ALJ's decision must be reversed or remanded for, essentially, four reasons: (1) the ALJ inappropriately failed to give controlling weight to the arthritic report assessment prepared by her treating physician, Dr. Peter Kiefer; (2) the ALJ inappropriately failed to consider evidence of several of Ms. Janakos' impairments; (3) the ALJ's findings were inconsistent with the testimony of the Vocational

36

Expert upon whose testimony the ALJ claimed to have relied; and (4) the ALJ inappropriately failed to consider certain evidence concerning the impact her impairments had on her job and daily life. The Court considers each argument in turn.

A. The ALJ's Treatment of Dr. Kiefer's Assessment

Ms. Janakos first argues that, by failing to mention or analyze the assessment prepared by Dr. Kiefer, Ms. Janakos' treating physician, the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

As Ms. Janakos correctly argues, an ALJ must evaluate whether a treating physician's opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). More specifically, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)). Indeed, "more weight is generally given to the opinion of a treating physician because of [her or his] greater familiarity with the claimant's conditions and circumstances." *Id.*; 20 C.F.R. § 404. 1527(d)(2).

An ALJ is not *required* to give controlling weight to a treating physician's assessment; but if he decides not to afford

37

such weight, he must articulate the reasoning behind that decision. See Steele, 290 F.3d 936, 941 (7th Cir. 2000) (noting that principles of administrative law require an ALJ to rationally articulate the grounds for a decision and confine courts' review to the reasons supplied by the ALJ, regardless of whether there is enough evidence in the record to support the ALJ's decision). If an ALJ determines that a treating physician is not entitled to controlling weight, the ALJ is required to specify the medical evidence that he considered inconsistent with the treating physician's opinion. See e.g. Freundt v. Massanari, No. 00-C-4456, 2001 WL 1356146, at *16 (N.D. Ill. October 31, 2002) (finding that ALJ's failure to specify any medical evidence inconsistent with a doctor's opinion was contrary to 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ failed to give controlling weight to Dr. Kiefer's assessment, and he failed to explain his decision not to; this was improper. And his failure is particularly notable because Dr. Kiefer's assessment clearly favors Ms. Janakos' claim for benefits.

In his June 15, 2004 "Arthritic Report," Dr. Kiefer indicates that Ms. Janakos suffers from fibromyalgia and carpal tunnel syndrome, which cause Ms. Janakos to experience pain in her hands and arms, stiffness in her hands, and swelling in both hands; his physical examination supported that, given that he

observed swelling in both of Ms. Janakos hands and wrists.  *Id.*
In his report, Dr. Kiefer noted that Ms. Janakos was restricted
by a number of functional abnormalities, including reduced
mobility in both of her thumbs, and that she possessed
significant limitations in performing repetitive reaching,
handling, grasping, turning, and twisting objects.  *Id.* at 244-
45.  Dr. Kiefer noted that Ms. Janakos had difficulty in
performing a series of tasks such as holding utensils, combing
her hair, or dialing a phone.  *Id.* at 245.  With regard to her
functional capacity, Dr. Kiefer concluded that Ms. Janakos could
stand or walk for only 30 minutes at a time without pain; that
she needed periods of time to walk around during an eight hour
day; that she could sit or stand for only 30 minutes at a
stretch; and that she also required a job that would permit her
to shift positions at will from sitting, standing, or walking.
*Id.*

If Dr. Kiefer's assessment were entitled to controlling
weight, the ALJ would have almost certainly concluded that Ms.
Janakos could not perform her work as a cashier.  First,
according to the assessment, she could only maintain a position
for 30 minutes.  And VE Yep testified that a minimum of 45
minutes was necessary for a cashier to be productive.  *Id.* at 39.
Second, Dr. Kiefer determined that Ms. Janakos was limited in

39

certain ways by her carpal tunnel impairments; she had difficulty holding utensils, combing hair, and turning pages of a newspaper, and, because of pain, she had decreased ability to perform fine manipulations. *Id.* at 244-55. According to the VE, these limitations would likely preclude her from working as a cashier. *Id.* at 41-42, 56.

To be sure, the ALJ was not *required* to give controlling weight to Dr. Kiefer's assessment. But he was required to explain why he decided that it was not entitled to such weight. The ALJ could have, for example, explained that the medical evidence from Dr. Kiefer's own progress notes and documentation were inconsistent with the conclusions he made in the assessment he prepared. The ALJ did not do this. While he made reference to some of Dr. Kiefer's progress notes, he made no mention of Dr. Kiefer's assessment at all, and he did not specify the medical evidence that he considered influential in his decision to give the assessment no weight. *Id* at 57. The ALJ did note a lack of detail in Dr. Kiefer's progress notes. But a lack of detail is not a valid basis for dismissing Dr. Kiefer's notes *or* his assessment. *E.g., Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (ALJ should have contacted doctor for more detail regarding medical information because "although a medical opinion on an ultimate issue such as whether a claimant is disabled is

not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary").

The Court recognizes that valid reasons may well exist to discount Dr. Kiefer's assessment of Ms. Janakos' functional capacity. But it is the job of the ALJ, not the job of this Court, to point to specific medical evidence that undermines the validity or weight of Dr. Kiefer's assessment. Given that more weight is generally given to a claimant's treating physician, which here, offers support for Ms. Janakos' claims that her impairments restrict her ability to work, the ALJ's failure to either mention the assessment or to articulate a reasoned basis for affording it no weight was inappropriate. The Court must, therefore, remand the case for further proceedings on this basis.

B.   The ALJ's Failure to Consider Evidence of Other Impairments

Next, Ms. Janakos argues that the ALJ's decision should be reversed or remanded because he failed to sufficiently address all of her impairments, including her obesity, her probable sleep apnea or related syndrome of marked fatigue, and her migraine headaches.

As to her alleged obesity and fatigue impairments, Ms. Janakos argues that the ALJ should have considered the impact of these impairments on her ability to perform her past relevant

41

work. The Court disagrees. On June 12, 2004, at the behest of
the SSA, Dr. Scott A. Kale examined Ms. Janakos and completed an
assessment report; he indicated in his clinical impression that
Ms. Janakos' problems included "[o]besity" and "[p]robable sleep
apnea or related syndrome of marked fatigue." Record at 240-43.
However Dr. Kale did not, nor did any other medical opinion in
the record, including Ms. Janakos' own treating physician,
explain how, or even if, obesity or fatigue aggravated any of Ms.
Janakos' impairments or contributed to her physical limitations
at work. Significantly, at the hearing before the ALJ, Ms.
Janakos made no claim that obesity or fatigue specifically
impaired her ability to work or otherwise limited her physically.
See Prochaska v. Barnhart, 454 F.3d 731, 737 (7th Cir. 2006)
(reasoning that because no medical opinion in the record
identified claimant's obesity as significantly aggravating or
contributing to her physical limitations, and because the
claimant failed to specify how her obesity further impaired her
ability to work, any error on the ALJ's part was harmless).
Given, that Ms. Janakos herself did not discuss these
impairments, and given the absence of any objective medical
evidence suggesting that the conditions affected her ability to
work, the Court can hardly fault the ALJ for failing to discuss
these impairments.

The same cannot be said about Ms. Janakos' migraine headaches. Ms. Janakos argues that the ALJ should have found greater work limitations due to her migraine headaches, and that the ALJ improperly rejected Ms Janakos' testimony concerning this impairment. At the hearing before the ALJ, Ms. Janakos testified that she had, in the past, experienced headaches a few times a week, but that she had learned to "catch the signs" and take steps to prevent a headache from becoming a "24-hour full blown, migraine." Record at 22. But she also testified that she still suffers full blown migraines a couple of times a month. And she also testified that, to properly treat her migraines, she would need to take two 5 to 10 minute breaks per week so that she could get and take her medication and prevent the headache from turning into a migraine. *Id.* at 26, 28, 41. VE Yep testified that an employer likely would not tolerate such unscheduled breaks. *Id.* Accordingly, if Ms. Janakos' testimony is to be believed, based upon the VE's testimony, the cashier job would be out.

In his decision, the ALJ reasoned that, although Dr. Kiefer's progress notes from October 28, 2004 indicate that Ms. Janakos suffered from migraine headaches, the notes did not indicate any type of aggressive treatment, and thus did not suggest a more severe residual functional capacity. Record at 57. Although an ALJ need not discuss every piece of evidence in

43

the record, he must confront the evidence that does not support his conclusion and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (remanding ALJ's decision because notably absent from the ALJ's decision was a discussion of how claimant's headaches and blurred vision affected her ability to work). Ms. Janakos' testimony suggests that her migraine headaches affected her ability to work, because she still experienced them a couple of times a month, and because she was unable to treat them without taking unscheduled breaks, which VE Yep testified, would be intolerable to an employer. Record at 22, 26, 28, 41. The record supports this impairment to some degree as it shows that her treating physician, Dr. Kiefer, indicated in his progress notes that she had a history of migraines and that he prescribed Imitrex. *Id.* at 276.

The ALJ's failure to appropriately confront this evidence raises three errors in his decision. First, the ALJ's failure to include Ms. Janakos' headaches in the list of work-related impairments he submitted to VE Yep was improper, since the hypothetical question an ALJ poses to a VE must incorporate all of the claimant's limitations supported by the record. *See Indoranto*, 374 F.3d at 474 (ALJ inappropriately failed to include headaches or blurred vision in the list of work-related impairments submitted to the VE).

44

Second, although Ms. Janakos told Dr. Kiefer, according to Dr. Kiefer's progress notes from May 18, 2003, that her headaches were "OK" when she took Imitrex, she also testified that the headaches affected her ability to work. The ALJ failed to consider this testimony or explain why he found it unbelievable. Record at 264. This was improper.

Third, the ALJ made an improper medical determination. The ALJ's only basis for concluding that Ms. Janakos' migraines did not cause further work limitations was that Dr. Kiefer's October 28, 2004 progress notes did not indicate that Ms. Janakos pursued any type of aggressive treatment. Record at 57. Although an ALJ is entitled to reject a claimant's testimony for lack of credibility, an ALJ is not permitted to make an independent medical determination. *See Rodriguez v. Barnhart*, No. 00-C-2005, 2001 WL 31155056, at \*\*6-7 (N.D. Ill. Sept. 27, 2002) (ALJ erred by inferring premise that claimant's pain condition usually resulted in certain manifestations and erred by discounting claimants allegations based on absence of these manifestations, despite no medical evidence in the record suggesting the claimant's pain usually involved the manifestations). Here, the ALJ made an improper medical determination when he decided that Ms. Janakos should have treated her migraine headaches more aggressively; there is simply nothing in the record to suggest

45

that such treatment was appropriate, or even available.

C.    The ALJ's Reliance on VE Yep's Testimony

Ms. Janakos next argues that the ALJ's decision was inconsistent with the testimony of Vocational Expert Christopher Yep. Ms. Janakos' argument relating to the VE's testimony centers around the VE's response to the ALJ's first hypothetical question, in which the ALJ asked the VE whether a person who was unable to use the hands for constant grasping and fine manipulation, among other limitations, could still perform past relevant work equivalent to Ms. Janakos' past work. Record at 38. The VE testified that the person *could* still work as a cashier. *Id.* Next, the ALJ changed the first hypothetical question to indicate that the person would be unable to use the hands for *repetitive* grasping and fine manipulation, as opposed to *constant* grasping and fine manipulation. *Id.* The VE testified that, with this limitation, the person *could not* work as a cashier. *Id.* However, after the first hypothetical question, which involved constant grasping and fine manipulation, when asking the second hypothetical question, the ALJ framed the question as "a step down" from constant grasping. *Id.* Therefore, given that that first hypothetical involved a person who had the seemingly more restrictive limitation of being unable to perform constant grasping, as opposed to the less restrictive

46

repetitive grasping limitation, it is unclear why the VE

testified that the person could perform the cashier job while

being unable to perform constant grasping, but could not work as

a cashier with the inability to perform repetitive grasping.

On questioning from Ms. Janakos' attorney, the VE testified

as follows:

Attorney: Okay. If say, if an individual has
numbness in their hands, even if they, let me backtrack
a bit. For the cashier position, you said that doesn't
involve constant fine manipulation and grasping, is
that?

VE: I said it does involve constant.
Attorney: Oh, it does?

VE: Right. When we went to hypothetical II where
it was repetitive, I eliminated the job at that point
in time.

Attorney: Okay. Okay. If an individual has
numbness in their hands, such that maybe five or six
times out of a work day, they will drop things or have
difficulty using their hands for maybe a five minute
stretch, would that affect any of the positions?

VE: It would not affect the position of the child
care position but it would eliminate the cashier
position, which is pretty much the same jump from
hypothetical I to hypothetical II. These are all she
is unable to use her hands on a constant basis. Record
at 41-42.

The ALJ stated that he was adopting the VE's testimony.

Record at 58. But, the ALJ's conclusion that, based on the VE's

testimony, Ms. Janakos is not disabled, appears to be

inconsistent. The ALJ precluded Ms. Janakos from "performing

47

jobs where constant grasping and fine manipulation are required."
*Id.* at 56. The VE testified, as evident in the above exchange,
that the job of the cashier *does* involve constant grasping and
fine manipulation. *Id.* at 41. Further, the VE testified that
both hypothetical questions "are all [Ms. Janakos] is unable to
use her hands on a constant basis." *Id.* at 42. Thus, Ms.
Janakos should not be able to perform her past relevant work as a
cashier, because, according to the VE's testimony, it involves
constant grasping. *Id.* at 41-42. Yet the ALJ concluded in his
decision, relying on the VE's testimony, that Ms. Janakos, *could*
perform her work as a cashier. *Id.* at 58.

If the VE's testimony is right, and if Ms. Janakos is
incapable of working any jobs that require constant fine
manipulation and grasping - and the ALJ found that she was - then
the conclusion that she could work as a cashier is simply wrong.
At a minimum, the VE's testimony was ambiguous, and the ALJ
should have explained how it led him to the conclusion that Ms.
Janakos could still work as a cashier. *See Hodges-Williams v.
Apfel*, No. 99-C-3465, 2000 WL 34342277, *8 (N.D. Ill. Sept. 29,
2000)(case remanded where ALJ misinterpreted VE's testimony,
noting remand as an option where a case may yield a different
result). The Court is unable to determine whether the ALJ made a
mistake in interpreting the VE's testimony, or, if he did not

make a mistake, why he came to the seemingly contradictory
conclusion that Ms. Janakos could still work as a cashier.
Accordingly, the case must be remanded so that the ALJ's
interpretation, reasoning, and determination, with regard to this
portion of the VE's testimony, can be developed enough for the
Court to conduct meaningful review.

## D.   The ALJ's Alleged Failure to Consider
##      Other Evidence Favorable to Ms. Janakos

Finally, Ms. Janakos argues that the ALJ's decision should
be reversed or remanded because he failed to address or
improperly rejected favorable testimony from both her and the VE
regarding her daily activities, her carpal tunnel syndrome, and
her fibromyalgia.  Specifically, she argues, he failed to
consider whether, and to what extent, these symptoms would affect
her ability to hold down her job as a cashier.

### 1.   Daily Activities

Ms. Janakos argues that the ALJ's credibility determination
concerning her daily activities was flawed.  She argues that the
ALJ placed undue weight on her ability to perform household tasks
and on the fact that she was able to work in some capacity.  But
an ALJ need only "minimally articulate his or her justification
for rejecting or accepting specific evidence of a disability,"
and an ALJ's credibility determinations are owed special

49

deference. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir.
2004). The ALJ satisfied this standard by citing to specific
evidence that, in his view, contradicted Ms. Janakos' subjective
allegations. Record at 58. The ALJ did acknowledged Ms.
Janakos' testimony that her ability to perform the activities
depended on how she felt in the morning. *Id*. But he pointed to
specific testimony, such as the fact that she was independent in
caring for her child without help from friends and family, and
the fact that she has been able to hold a job, as evidence
contrary to her subjective allegations that she could not perform
her basic daily activities. *Id*. Thus, the ALJ clearly
articulated the reasons why he found less than credible Ms.
Janakos' claim that she is unable to perform basic activities of
daily living. Because the ALJ clearly expressed those reasons,
this Court must afford special deference to the ALJ's credibility
determination with respect to Ms. Janakos' daily activities.

## 2. Carpal Tunnel Syndrome

Ms. Janakos also argues that the ALJ did not minimally
articulate his justification for rejecting certain evidence with
respect to her carpal tunnel syndrome; and thus, the ALJ's
credibility determinations with regard to this impairment were
improper. At the hearing, Ms. Janakos testified that she drops
money, aerosol cans, and other items "all the time" while working

as a cashier. Record at 35. Relatedly, the VE testified that if numbness in the hands caused a person to drop items five or six times a day or caused a person to have difficulty using her hands for a five minute stretch, the person could not perform the cashier position. *Id.* at 42. Thus, if the testimony of Ms. Janakos and the VE is to be believed, Ms. Janakos might be restricted in a way other than that noted by the ALJ.

Notably, in his decision, the ALJ did not specifically address this evidence. Instead, the ALJ made only the conclusory determination that Ms. Janakos' "subjective allegations lack credibility to the extent that they fail to describe restrictions that would support a finding of more restrictive limitations." *Id.* at 58. While an ALJ's credibility determinations are generally entitled to substantial deference, that is true only when the ALJ explicitly makes such findings and explains them in a way that affords meaningful review. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *see also Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1983) (courts must defer to an ALJ's credibility determinations only when explicitly made and explained; it is not "merely 'helpful' for the ALJ to articulate reasons (e.g. lack of credibility) for crediting or rejection sources of evidence . . . [i]t is absolutely essential for meaningful appellate review"). Here, the ALJ's conclusory

finding fails to satisfy this standard. Unlike his discussion of how Ms. Janakos' own testimony undermined her claim that she could not perform her daily activities, the ALJ did not point to specific evidence that undermined her testimony that she dropped items at work all the time.

The Commissioner argues that substantial evidence supports the ALJ's findings with regard to Ms. Janakos' limitations in connection with her carpal tunnel syndrome; the Commissioner notes that the ALJ discussed the relevant medical evidence for her alleged carpal tunnel syndrome. Record at 57. For example, the ALJ noted that a January 2000 medical report from Dr. Lopez showed that Ms. Janakos' Tinel's and Phalen's exams were normal and that a December 16, 2002 EMG study from Dr. Levy showed that the results were normal for both harms. *Id.* Although the ALJ did point to certain objective medical evidence, he did not address Ms. Janakos' testimony that she was prone to drop objects at work and the VE's testimony that a person could not be a cashier if she dropped items five or six times a day. Nor did he specifically say that the objective medical evidence was the reason why he found Ms. Janakos' subjective allegations to lack credibility. Given Ms. Janakos' unrebutted testimony, if the ALJ found Ms. Janakos to be less than fully credible, he was required to explain his findings in this regard and he failed to do so.

This was inappropriate, and the Court must, therefore, remand the case on this basis.

3. Fibromyalgia

The ALJ's conclusion that Ms. Janakos' subjective allegations lacked credibility to the extent that she failed to describe restrictions that would support a finding of more restrictive limitations, is also an insufficient justification for why he rejected Ms. Janakos' testimony regarding her fibromyalgia. Record at 58.

At the hearing, Ms. Janakos testified that she could only sit or stand for 20 to 30 minutes at a time; similarly, her treating doctor, Dr. Kiefer, indicated on his assessment that she could only sit or stand for 30 minutes "at a stretch." Id. at 32, 245. Along those lines, the VE testified that a cashier must be able to maintain a position for at least 45 minutes in order to be productive, and that a limitation of sitting or standing for only 30 minutes at a time would affect a person's ability to work as a cashier. Id. at 41, 42. Thus, if the testimony of Ms. Janakos and the VE is to be believed, Ms. Janakos is precluded from working as a cashier.

In his decision, the ALJ did not specifically address the evidence and testimony about Ms. Janakos' alleged sitting and standing limitations. And while the Commissioner, again, seems

53

to think the ALJ chose not to mention this evidence because he
disbelieved Ms. Janakos' testimony and because substantial
evidence supported a contrary conclusion, the Court is unable to
determine whether that is, in fact, the case. Specifically, the
Commissioner points to the fact that the ALJ noted that a June
2004 consultative examination completed by Dr. Kale revealed that
Ms. Janakos failed the diagnostic threshold for fibromyalgia and
that she demonstrated normal gait, strength, and range of motion.
*Id.* But the ALJ did not cite this evidence as the reason for
finding Ms. Janakos less than credible. And, as discussed above,
the ALJ's credibility determination is only entitled to
substantial deference if the ALJ explicitly makes such findings
and explains them in a way that affords meaningful review. *See*
*Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). He did
not do so here.

## Conclusion

For the reasons set forth above, the Court finds that the
ALJ failed to build an accurate and logical bridge between the
record evidence and his ultimate conclusion that Ms. Janakos is
capable of performing her past relevant work as a cashier. In
particular, he failed to mention and explain why he afforded Ms.
Janakos' treating physician's assessment little or no weight, and
he failed to adequately consider evidence concerning Ms. Janakos'

migraine headaches and the effects of those headaches on her ability to work. Additionally, in concluding that Ms. Janakos could perform her past relevant work as a cashier, the ALJ relied on testimony from the VE that was, at best confusing and, at worst, nonsensical. He also failed to adequately support his credibility determinations. Accordingly, the Court will grant Ms. Janakos' Motion for Summary Judgment [#20], and deny the Commissioner's Motion for Summary Judgment [#24]. The matter is remanded for further proceedings consistent with this opinion. On remand, the ALJ may wish to consider the relevant factors under step five of the social security regulations.

Dated: January 16, 2007

ENTER:

ARLANDER KEYS
United States Magistrate Judge